## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

| | |
|---|---|
| BOWE MARVIN, et al., | |
| Plaintiffs, | |
| v. | CASE NO. 3:20-CV-553-MGG |
| DAVID HOLCOMB, et al., | |
| Defendants. | |

## OPINION AND ORDER

Plaintiff Bowe Marvin ("Plaintiff" or "Bowe") has sued the Defendants—Officer David Holcomb ("Holcomb"), Corporal Christopher Lawson-Rulli ("Lawson-Rulli"), Patrolman Matthew Corban ("Corban"), and the St. Joseph County Sheriff's Department ("the Department")—for events that occurred at Bowe's home on April 3, 2015. On that date, Holcomb, Lawson-Rulli, and Corban (collectively, "the Defendant officers") were dispatched to Bowe's home in Mishawaka, Indiana, after Bowe's mother, Michelle Marvin ("Michelle")[1], called 911 and requested that police perform a welfare check on Bowe. The Defendant officers knocked on the door of the home and remained outside while conversing with Bowe as he stood in the doorway. Believing Bowe to be uncooperative and combative during this conversation—especially in response to questions as to whether Bowe had a weapon—Holcomb and Lawson-Rulli subsequently grabbed hold of Bowe. All three then fell to the ground below the

---

[1] As Bowe and his parents all have the same last name, the Court will refer to these individuals by first name for clarity.

doorway. Holcomb and Corban then subjected Bowe to physical force before handcuffing him. Bowe was charged with battery and resisting arrest, but the charges were ultimately dismissed.

Bowe filed the instant action on June 10, 2020. His three count Amended Complaint asserts claims under 42 U.S.C. § 1983, contending that the Defendant officers unlawfully entered his home and used excessive force in violation of the Fourth Amendment. Bowe also alleges state law claims for trespass, battery, and excessive force contending that the Department is vicariously liable for the Defendant officers' actions. [DE 48]. Defendants have moved for summary judgment on all claims.

The undersigned now issues the following opinion and order with jurisdiction conferred by the parties' consent [DE 34, DE 41] and 28 U.S.C. § 636(c). For the reasons stated below, Defendants' motion is granted in part and denied in part. [DE 66].

## I.   FACTS

The following facts are taken in the light most favorable to Plaintiff and are primarily not in dispute except where noted. For the purposes of this motion, any facts not addressed are taken as undisputed in accordance with Fed. R. Civ. P. 56(e)(2).

On April 3, 2015, Bowe was twenty-one years old and living with his father, Greg Marvin ("Greg") in a farmhouse in Mishawaka, Indiana. Bowe's mother Michelle drove to Greg's home that day to talk to Bowe about moving out of Greg's house and coming to live with her instead. This led to a heated argument between Michelle and Bowe, which culminated in Bowe breaking his mother's sunglasses in two, flipping an ashtray, and throwing a chair. The chair hit Michelle in the face and cut her lip. After that,

Michelle left the house and got in her truck, which was parked in the driveway in front of the house. From there, she called 911 and asked the dispatcher for a welfare check on Bowe because she was concerned that Bowe was acting suicidal. During the call, the dispatcher asked if Bowe carried any weapons, to which Michelle responded that Bowe typically carried a box cutter knife in his pocket. Michelle has explained that this kind of knife is typical for living on a farm and indicates she would have related that same information to the dispatcher. [Michelle Dep., DE 69-2 at 18].

Holcomb, Lawson-Rulli, and Corban were contacted by the dispatcher to perform the welfare check. The dispatcher notified the Defendant officers that Bowe was possibly suicidal, and that Bowe typically carried a box cutter. The officers arrived at the home shortly thereafter, first encountering Michelle, who was still sitting outside of the house in her truck. She was holding a wad of napkins to her lip to stop the bleeding. The officers observed the cut in her lip and asked her about her injury. Michelle initially refused to answer these questions, instead responding by stating "I'm fine. I want you to check on my son" and "I'm fine. I'm worried about my son." [Michelle Dep., DE 67-2 at 8-9; Holcomb Dep., DE 67-3, at 4]. However, after the officers explained that they would not approach the house until Michelle answered them, she explained that she and Bowe had argued, and that Bowe had thrown a chair at her.

The officers then approached the front door to the home. The front door is elevated a few feet above the ground with three wooden steps leading up to it, and the door opens inward. Defendant Corban knocked, and Greg opened the door. Corban

indicated that he needed to speak with Bowe. Bowe, overhearing the officer asking for

him, walked over. Once Bowe walked over, Greg stepped back behind Bowe.

Bowe and the Defendant officers spoke to one another through the open

doorway. Michelle, who was still in her truck outside of the house, observed the

interaction and recorded a video on her phone while the Defendant officers and Bowe

spoke. [Michelle Dep., DE 69-2 at 21].  As Bowe and the officers conversed, the officers

stood on the ground a few feet below the door, with one of them resting his foot on the

first step of the stairs that led to the door. [Michelle Photograph, DE 69-10]. Bowe stood

in the doorway of the house with one hand resting on the inwardly-opened door, and

the other hidden behind the doorframe. [Lawson-Rulli Dep., DE 67-5 at 5; Michelle

Photograph, DE 69-10]. A still photograph taken from Michelle's video also shows

Bowe's feet obscured by the doorframe. [DE 69-10].

Bowe's memory of his conversation with the officers is "blurry." [Bowe Dep., DE

67-1 at 10]. Bowe only recalls that the conversation mainly consisted of the officers

asking Bowe why they were called, with Bowe responding that he did not know

because he was not the one who called them. According to the officers, Bowe failed to

directly questions and refused to show both of his hands when asked. The officers also

asked Bowe several times to come out of the house to talk, but Bowe declined.

Moreover, when the officers asked Bowe whether he had a weapon, Bowe recalls

responding by saying "no." [Bowe Dep., DE 67-1 at 14]. However, the officers indicate

that Bowe kept responding to this question by saying "What?" and "What do you

mean?" [Holcomb Dep. DE 67-3 at 7-8]. Bowe explained that he "wouldn't have called

[the box cutter] a weapon" as it was not used as one, and that he may have subsequently stated "what" or "what do you mean" for this reason. [Bowe Dep., DE 67-1 at 12; 13-14]. According to the officers, however, these responses made Bowe appear "distracted," "sarcastic," "standoffish," and "uncooperative." [Lawson-Rulli Dep., DE 67-5 at 6; Holcomb Dep. DE 67-3 at 7-8]. Moreover, after Bowe failed to directly answer the officers' questions about a weapon, Greg came back up to the doorway, reached into the back pocket of Bowe's pants, and pulled out the box cutter. [Bowe Dep., DE 67-1 at 15]. Holcomb and Lawson-Rulli then looked at one another and, without any verbal exchange, decided to grab hold of Bowe to gain control over him. The officers did not announce that Bowe under arrest prior to grabbing him.

The parties dispute precisely where Bowe was standing when the officers grabbed hold of him. Bowe contends that when his father reached into his pocket and pulled out the box cutter, Bowe turned to his right to look back at this father, moving further into the house. [Bowe Dep., DE 69-1 at 20]. Accordingly, Bowe contends that when Holcomb and Lawson-Rulli reached up and grabbed his hands, his entire body was inside the house. [Bowe Dep., DE 69-1 at 20]. Holcomb, however, contends that Bowe was "still leaning in the doorframe, the threshold of the door" and that Bowe's hand or forearm was out of the threshold such that the officers did not need to cross the threshold of the doorway when they reached up and grabbed Bowe. [Holcomb Dep., DE 67-3 at 9, 11]. Likewise, Lawson-Rulli does not recall that any part of his body crossed the threshold when he grabbed onto Bowe. [Lawson-Rulli Dep., DE 67-5 at 6]. Holcomb does not recall where Bowe's feet were situated when they grabbed Bowe.

[Holcomb Dep., DE 67-3 at 9]. Lawson-Rulli recalls that Bowe's feet were in the threshold of the doorway. [Lawson-Rulli Dep., DE 69-4 at 7]. Holcomb's police report prepared later that day describes that the officers pulled Bowe "out of the house" and "from the door." [DE 69-6]. Likewise, Corban's police report prepared later that day similarly describes that the officers pulled Bowe "outside of the home." [DE 69-8]. Lawson-Rulli's report does not indicate Bowe's position. [DE 69-7].

After Holcomb and Lawson-Rulli grabbed Bowe, all three fell to the ground a few feet below the door. After hitting the ground, Bowe started to stand up, but Corban came over and wrapped his arms around Bowe's legs, bringing Bowe back to the ground. Bowe admits that he cannot remember what the officers said to him after they all hit the ground. [Bowe Dep., DE 67-1 at 23]. According to Holcomb and Corban, after they hit the ground, they commanded Bowe to show his hands and asked him to calm down, but instead Bowe was actively resisting, physically combative, and trying to get away. [Holcomb Dep., DE 67-3 at 14]. The officers also told Bowe that he was resisting. Lawson-Rulli's police report also indicates that he heard Holcomb and Corban telling Bowe to show his hands and to stop resisting. Bowe has stated that "i[t] is possible that they said [he] was resisting." [Bowe Dep. DE 67-1 at 23].

After Bowe failed to show his hands to the officers or otherwise respond to their commands, Holcomb discharged the prongs of his Taser on Bowe. When the Taser did not seem to affect Bowe, Holcomb discharged it again using the "drive stun" technique, placing the Taser directly on Bowe. As the drive stun also did not affect Bowe, Holcomb then used hand strikes on Bowe, ultimately hitting Bowe with one closed hand strike

and several open hand strikes. After using the strikes, the officers were able place Bowe in handcuffs, and Bowe became compliant. The officers did not use any other force on Bowe, and they called paramedics to assess Bowe and to remove the taser prongs. Bowe had a concussion and a broken toe.

As a result of this incident, Bowe was charged with battery and resisting arrest, but the charges were later dismissed.

## II.  ANALYSIS

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). A "genuine issue" exists regarding a material fact when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). Accordingly, the Court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is

a material dispute that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Indeed, the court is not "obligated to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

To overcome a motion for summary judgment, the nonmoving party cannot rest on the allegations or denials contained in his pleadings. Rather, the nonmoving party must present sufficient evidence to show the existence of each element of his case on which he will bear the burden at trial. *Celotex*, 477 U.S. at 322–23; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

Here, Plaintiff has brought § 1983 claims against the Defendant officers, contending that they entered his home and used excessive force in violation of the Fourth Amendment. Plaintiff also brings state law claims for trespass, battery, and excessive force, contending that the Department is vicariously liable for the officers' actions. Defendants move for summary judgment on all counts.

A. **Claims Against the St. Joseph County Sheriff's Department**

The Department first moves for summary judgment contending that, as a county police department, it "is not a suable entity." [DE 67 at 10; DE 70 at 5].

Local governmental entities can be liable under § 1983 for unconstitutional policies or customs. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 684 (1978). However, the capacity of a party to sue and be sued, when that party is not an individual or a corporation, is determined by the law of the state where the court is located. Fed. R. Civ. P. 17(b)(3). As such, a local governmental unit is considered the proper defendant under § 1983 if, under state law, it is the unit responsible for setting the policy or custom at issue. *McMillan v. Monroe Cnty.*, 520 U.S. 781, 785 (1997); *see also Riley v. Lake Cnty.*, No. 2:17 CV 368, 2018 WL 3239732, at *4 (N.D. Ind. July 3, 2018).

Under Indiana law, a "[m]unicipal corporation" is defined as a "unit, . . .or other separate local governmental entity that may sue and be sued." Ind. Code § 36-1-2-10. "Unit" is further defined as a "county, municipality, or township." Ind. Code § 36-1-2-10. Based on this, the Department contends that, as a department within St. Joseph County, it is neither a unit or a separate local government entity that maybe be sued. In support, the Department primarily relies on *Sow v. Fortville Police Dept.*, 636 F.3d 293 (7ᵗʰ Cir. 2011) and *Miller v. St. Joseph Cnty.*, No. 2:11-cv-217, 2014 WL 3740175 (N.D. Ind. July 30, 2014). Plaintiff, however, contends that the Department is considered a separate suable entity under Indiana law, relying on *Hamann v. Starke Cnty.*, No. 3:18-cv-952-PPS-MGG, 2019 WL 1438294, at *3 (N.D. Ind. 2019) and *Frazee v. Dearborn Cnty. Sheriff's Dep't,* No. 416CV00005SEBDML, 2017 WL 4650874, at *11 (S.D. Ind. Oct. 17, 2017).

In *Sow*, the plaintiff sued the Fortville Police Department ("FPD") and one of its officers as well as the McCordsville Police Department ("MPD"), bring claims under 42 U.S.C. §§ 1983, 1985, and 1986, as well as numerous state law claims. *See* 636 F.3d at 293. The court in *Sow* found that the FPD and MPD were not proper parties to the suit, stating "[t]he United States has instructed that local government liability under § 1983 is 'dependent on an analysis of state law'" and found that, as municipal police departments, the MPD and FPD do not have the capacity to be sued under Indiana statute. 636 F.3d at 300. Moreover, in *Miller*, the plaintiff sued St. Joseph County, the St. Joseph County Sheriff, the Department, and numerous individuals. Regarding the Department, the plaintiff alleged racial discrimination under color of law in violation of 42 U.S.C. § 1983.  Considering the plaintiff's § 1983 claims against the Department, the Court found that the Department could not be sued, stating: "[d]efendants contend that no section 1983 claim can be maintained against the St. Joseph County Police Department because it is merely a municipal department and not a suable entity. Defendants are right in this contention." *Id.* at *9.

Initially, this authority appears to directly to support the Department's contention that it is not suable in the instant action. However, first, it is unclear whether this authority—which addresses the ability of a police department to be sued under § 1983—also applies to Plaintiff's instant state law claims.  This is because § 1983 "vindicate[s] rights, privileges or immunities that are guaranteed by the U.S. Constitution or a federal statute." *Narducci v. Moore*, 572 F.3d 313, 318-19 (7th Cir. 2009). However, § 1983 does not provide a vehicle for relief for state tort claims. *See Mahoney v.*

*Beacon Health Ventures*, No. 3:19-CV-1130-RLM, 2022 WL 445503, at *6–7 n. 4 (N.D. Ind.

Feb. 14, 2022) (citing *Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 61 L.Ed.2d 433

(1979)). Here, while Plaintiff has alleged both constitutional violations under § 1983 and

state law tort claims, Plaintiff has only alleged that the Department is vicariously liable

for the Defendant officers' violations under state tort law. Accordingly, the Department

does not address whether it is still entitled to summary judgment on Plaintiff's state law

tort claims if it is not suable under § 1983.

Moreover, this court subsequently has distinguished Defendant's authority, first

finding that *Sow* was based upon a suit brought against city police departments rather

than a county sheriff's department, and because city police and county sheriff's

departments are defined differently under Indiana, a decision regarding a city police

department does not mandate the same decision for a county sheriff's department.

*Mahoney*, 2022 WL 445503, at *7. This court similarly distinguished *Miller* even though it

found that the Department could not be sued, noting that the *Miller* court also based its

finding on cases involving a city police department. *Id.*

On reply, the Department further argues that it is not the proper entity for the

instant matter based upon state law. The Department states that Indiana statute only

establishes duties for the sheriff and not for the department, and that, if the

determination is based upon who employs the individual officers, the county, rather

than the Department, is the proper entity for the instant action. Arguments raised for

the first time in a reply brief are typically considered waived. *White v. United States*, 8

F.4th 547, 552 (7th Cir. 2021) (internal citations omitted). Yet even considering the substance of these arguments, the Department's position is unavailing.

The Department's first argument on reply—that Indiana statute only establishes duties for the sheriff and for the Department—appears to effectively argue that the St. Joseph County Sheriff, rather than the Department, is the proper entity to be sued. However, suits against a government official in their official capacity are typically considered a suit against that officer's agency or department. *Mahoney*, 2022 WL 445503, at *7 (internal citations omitted). Indeed, this court, finding that the Department is suable, has explicitly stated that "[a] suit against [the St. Joseph County Sheriff] in his official capacity would really be a suit against the St. Joseph County Sheriff Department, which is what [the plaintiff] has brought." *Id.*

Moreover, the Department's second argument contends that if Plaintiff seeks to hold the Department liable under a theory of *respondeat superior* liability based on who employs the Defendant officers, St. Joseph County is the proper entity. In support, the Department points to Indiana Code § 36-2-16-4, which states that the sheriff only has authority to appoint deputies or employees as "authorized by the county fiscal body." While it is true that Department employees are considered county employees, the sheriff assigns their duties and is responsible for their official acts. Ind. Code § 36-8-10-4(a); *see also* Vandewalle v. Moffa, No. 3:07-cv-400 PS, 2009 WL 631244, at *3 (N.D. Ind. Mar. 10, 2009) ("Although officers employed by the sheriff's department are employed by the county, they operate under the control of the county sheriff.").  Moreover, the Court's holding in *Hamann*, relied upon by Plaintiff, further refutes the Defendants'

position that the county is the property entity to be sued in this context. Specifically, the court in *Hamann* explained that "[a] sheriff's department acts independently of a county board of commissioners and there is no agency relationship . . . ." 2019 WL 1438294, at *3 (internal citations omitted). Indeed, under Indiana law, a sheriff's department is separately established by the state constitution, and the sheriff is independently elected. Accordingly, the sheriff answers to a county's citizens rather than other county officers. *See* Ind. Const. art. VI, § 2; *Markley v. Walters*, 790 F. Supp. 190, 191 (N.D. Ind. 1992).

As the sheriff is independently elected, assigns sheriff's deputies' duties, and is responsible for the deputies' official acts, the Department is a proper defendant in this action. *Mahoney*, 2022 WL 445503, at *6–7. Indeed, courts have found that an Indiana sheriff's department may be held vicariously liable for torts committed by its employees within the scope of employment, which is what Plaintiff has alleged. *See Frazee*, 2017 WL 4650874, at *11; *see also Harrison Cnty. Sherriff's Dep't v. Ayers*, 70 N.E.3d 414 (Ind. Ct. App. 2017). Accordingly, the Department's motion for summary judgment on the grounds that it is not a suable entity or the proper entity for this action is denied.

**B.    Plaintiff's § 1983 Claims Against the Defendant Officers**

Next, the Defendant officers move for summary judgment on both Plaintiff's § 1983 unlawful entry and excessive force claims, contending that (1) not all the officers were personally involved in each of the events that occurred; (2) the Defendants are entitled to qualified immunity because the undisputed material facts show that the Defendants did not violate Plaintiff's constitutional rights; and (3), even if the facts taken in the light most favorable to Plaintiff do make out a constitutional violation, the

Defendant officers are still entitled to qualified immunity because the constitutional rights at issue were not clearly established.

### 1.   Personal Involvement

Defendants first contend that the undisputed material facts demonstrate that Defendant Corban was not involved in pulling Bowe from the doorway, and Defendant Lawson-Rulli was not involved in any of the acts which Plaintiff contends constitute excessive force. Accordingly, Defendants contend that Defendant Corban is entitled to summary judgment on Plaintiff's unlawful entry claim, and that Defendant Lawson-Rulli is entitled to summary judgment on Plaintiff's excessive force claim.

Plaintiff does not dispute these facts, but instead contends that all Defendant officers played a role in the events at his home, and accordingly, all are directly responsible such that they are subject to § 1983 liability for both claims. Specifically, Plaintiff contends that, although Defendant Lawson-Rulli had no further contact with Plaintiff after he grabbed Plaintiff at the doorway, his act in removing Plaintiff is what made it possible for Defendants Corban and Holcomb to subject Plaintiff to excessive force. Likewise, Plaintiff contends that although Defendant Corban was not involved in initially grabbing Plaintiff, he knew about, facilitated it, and condoned it, relying on *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017).

"[T]he Supreme Court has foreclosed *respondeat superior* liability for section 1983 actions, [so] a plaintiff may hold a government official liable only for his or her own misconduct." *See Kemp v. Fulton Cnty.*, 27 F. 4th 491, 497-98 (7th Cir. 2022). Accordingly, a plaintiff must show a defendant's personal involvement or participation in the alleged

violation, or a defendant's direct responsibility for the alleged violation. *Piggie v. Riggle*, 548 F.Supp.2d 652, 657 (N.D. Ind. 2008); *Starzenski v. City of Elkhart*, 87 F.3d 872, 879 (7th Cir. 1996).  Supervisors may be liable for a subordinate's deprivation under § 1983 only if they are personally responsible for it.  To show such responsibility, courts have found that a plaintiff must show that "the supervisor . . . 'kn[e]w about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what they might see.'" *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (citing *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir 1988).

Although Plaintiff contends that the Defendant officers should be liable for one another's conduct because they each knew about the others' actions, facilitated it, and condoned it, Plaintiff did not present any facts to show a supervisory relationship between the Defendant officers such that the officers can be personally liable for the others' actions. Moreover, Plaintiff's authority similarly addresses a claim brought against a supervisor. Plaintiff also does not present any facts showing that Defendant Corban was involved in removing Plaintiff in the doorway or that Defendant Lawson-Rulli was involved in the actions constituting excessive force. Accordingly, Defendants are entitled to summary judgment on Plaintiff's unlawful entry claim as it pertains to Defendant Corban as well as summary judgment on Plaintiff's excessive force claim as it pertains to Defendant Lawson-Rulli.

The Court now considers Plaintiff's unlawful entry claim as to Holcomb and Lawson-Rulli and Plaintiff's excessive force claim as to Holcomb and Corban.

### 2.     Constitutional Violations

Plaintiff has brought his unlawful entry and excessive force claims under § 1983, and Defendants have raised a defense of qualified immunity, first contending that the undisputed material facts demonstrate that there was no violation of Plaintiff's constitutional rights.

The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate a "clearly established" constitutional or statutory right. *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). Once a defendant raises a qualified immunity defense, the plaintiff carries the burden of defeating it. *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 359 (7th Cir. 2005). Evaluating this defense requires the Court must make two inquiries: (1) whether the facts—which the Court views in the light most favorable to Plaintiff—show a violation of a statutory or constitutional right, and (2) whether that right was "clearly established" at the time of the alleged violation. *Williams v. Chicago*, 733 F.3d 749, 758 (7th Cir. 2013). "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (emphasis in original).

The Court is not required to address the prongs in this order; instead, the Court may address the prongs in the order "best suited to the circumstances of the particular case at hand." *McAllister*, 615 F.3d at 881. In this case, however, it makes sense to address the prongs in order, as the second prong applies only to the federal claims, and Plaintiff's state law claims also turn on the lawfulness of the relevant events.

16

a. **Unlawful Entry**

Defendants move for summary judgment on Plaintiff's unlawful entry claim, first contending that Defendants Holcomb and Lawson-Rulli's[2] actions in grabbing Plaintiff as he stood in his doorway did not violate Plaintiff's constitutional rights.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  It protects a person's reasonable expectation of privacy in numerous settings, but individuals inside their homes have heightened protection. *Payton v. New York*, 445 U.S. 573, 585-86 (1980). At the core of the Fourth Amendment is "the right of a man to retreat into his own home and therefore be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961).

Accordingly, a warrantless arrest in a public place based upon probable cause does not violate the Fourth Amendment, but searches and seizures that occur inside the home without a warrant are presumed unreasonable, even with probable cause, unless the officer obtains consent to enter the home or there are exigent circumstances. *U.S. v. Santana*, 427 U.S. 38, 42 (1976); *see also Sparing v. Village of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001).  Exigent circumstances include the need to provide emergency assistance to an injured occupant in a home, to protect an occupant in the home from imminent harm, to extinguish a fire, and to protect the imminent destruction of

---

[2] For purposes of this section, any reference to Defendants or the Defendant officers refers only to Defendants Holcomb and Lawson-Rulli.

evidence.  *See Kentucky v. King*, 563 U.S. 452, 455 (2011); *see also Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (internal citations omitted).

From this, the line seems quite clear: entering a home without a warrant absent consent or exigent circumstances "by even a fraction of an inch [is] too much." *Kyllo v. United States*, 533 U.S. 27, 37 (2001) (internal citations and punctuation omitted). However, courts have previously recognized that "'where outside ends and where the home begins is not a point immediately obvious.'" *Sparing,* 266 F.3d at 689 (internal citations omitted). Moreover, "[s]plitting fractions of an inch can be a very treacherous endeavor, producing arbitrary results." *Id.* Accordingly, when considering whether the existence of probable cause alone is not sufficient for a warrantless entry, this Court need not "pull out our rulers and begin to measure." *Id.* (internal citations omitted). Rather, "the point must be identified by inquiry into reasonable expectations of privacy." *Id.* "A reasonable expectation of privacy is infringed when (1) [an individual] exhibits an actual or subjective expectation of privacy and (2) the expectation is one that society is prepared to recognize as reasonable." *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006)(citing *Katz v. United States*, 389 U.S. 347, 361 (1967).

Here, the Defendant officers contend that they did not violate Plaintiff's constitutional rights because, at the time they seized Plaintiff, he was voluntarily standing in his doorway—where Plaintiff had no expectation of privacy, such that it is a public place for purposes of the Fourth Amendment—and the Defendant officers otherwise never entered Plaintiff's home. In support, the Defendant officers primarily rely on *United States v. Santana*, 427 U.S. at 42.

In *Santana,* law enforcement officers had probable cause to arrest Santana for drug crimes and drove to her house to arrest her. When the officers pulled up, they found her standing in her doorway holding a brown paper bag. *Id.* at 40. Specifically, the officers stated that Santana "was standing directly in her doorway [as] one step forward would have put her outside, one step backward would have put her in the vestibule of her residence." *Id.* at 39 n. 1. The officers exited their vehicle, announced their presence, and began to approach Santana to arrest her. *Id.* at 40.  Santana, however, retreated into her house. The police then followed her through the open doorway and arrested her inside her home. *Id.* at 40-41.

The Supreme Court upheld Santana's warrantless arrest inside the home, finding that Santana, who was standing in her doorway when the police pulled up to her home, was in a "public place," as "[s]he was not in an area where she had any expectation of privacy." *Id.*; *see also Katz,* 389 U.S. at 381 ("What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection.")  The Supreme Court further found that Santana could not "thwart an otherwise proper arrest" by retreating into the privacy of her home. *Id.* at 43.

Based on this, the Defendant officers contend that Bowe, like Santana, was "voluntarily standing in the threshold of [his] home (i.e., in the middle of an open doorway) [which] is outside rather than inside the home for purposes of the Fourth Amendment." [DE 67 at 14, quoting *Santana,* 427 U.S. at 42.] While it is true that both Bowe and Santana were standing in the doorway when they encountered the police, the

19

similarities end there such that the Court cannot find Defendants are entitled to summary judgment based on the holding of *Santana*.

First, Santana was already standing in her open doorway when the police arrived and began to approach her. Bowe, however, came to the doorway only after the officers knocked on the door and he overheard the officers asking for him. Courts in the Seventh Circuit applying *Santana* have distinguished the privacy expectations implicated when an individual comes to the door in response to a knock. Specifically, the Seventh Circuit in *Sparing v. Village of Olympia Fields* found that a person does not "surrender reasonable expectations of privacy in the home by simply answering a knock at the door." 266 F.3d at 690. Indeed, in *United States v. Berkowitz*, the Seventh Circuit, while discussing *Santana*, observed that "there is a significant different between a person who for no reason voluntarily decides to stand in his open doorway, and a person who merely answers a knock on the door." 927 F.2d 1376, 1388 (7th Cir. 1991). Indeed, the court in *Berkowitz* further stated that a person who "answers the knock and stays within the house is not voluntarily exposing himself 'to public view, speech, hearing, and touch as if [he is] standing completely outside [his] house.'" *Id.* at 1388.

Defendants attempt to distinguish *Sparing* and *Berkowitz*, contending that Bowe was not the one who initially opened the door in response to the officers' knock and that Bowe voluntarily came to the door when he heard the officers ask about him. Defendants also contend that he was fully visible as he stood in the doorway, and Bowe did not attempt to shut the door on the officers. However, the Court cannot find that these distinctions show that Defendants are entitled to judgment as a matter of law.

First, while Bowe knew that law enforcement officers were at the door when he walked over, the Court cannot find that Bowe was "*for no reason* voluntarily . . . stand[ing] in his open doorway" when he encountered the officers, as he only came to the door because he heard the officers asking for him. *Berkowitz*, 927 F.2d at 1388 (emphasis added). And while it may be true that no facts show that Bowe attempted to close the door, in *Berkowitz*, the court addressed this issue, stating that when an individual responds to a knock, he "has not relinquished his right to close the door on the unwanted visitors." *Berkowitz*, 927 F.2d at 1387.[3]

Further, in *Kentucky v. King*, the Supreme Court stated that when law enforcement officers knock on a door without a warrant, they can do no more than any other private citizen. *See* 563 U.S. 452, 469 (2011). Indeed, an occupant has no obligation to answer the door or speak to an officer who knocks on a door under such circumstances. *Id.* Accordingly, *King* also provided that, if an occupant does choose to open the door and speak to the officers, the occupant may still decline to answer any questions or refuse to allow the officers to enter the premises. *Id.*

The Defendant officers also contend that the way that Bowe was standing and leaning in the doorway put him outside such that when the officers grabbed hold of him, neither officer crossed into the threshold of the home. Bowe, however, contends that the officers grabbed hold of him when his entire body was inside the house, as he had just turned back further into his home to look at his father after his father removed

---

[3] Moreover, the evidence does not show whether Bowe would have had the opportunity to close the door, as the Defendant officers did not tell Bowe he was under arrest before reaching for him, and the Defendant officers never verbalized their intent to grab hold of Bowe before reaching for him.

the box cutter knife from Bowe's back pocket. A still photograph of the encounter shows Bowe standing in the door with his feet obscured behind the doorframe, with one hand resting on the door opened inward and the resting on the edge of the doorframe. [DE 69-10]. The police officers' reports also describe that Bowe was pulled outside or out of the house.

Accordingly, there remains a dispute as to whether—and how much—the Defendant officers crossed the threshold of Bowe's home when they seized him, and whether this violated Bowe's reasonable expectation of privacy based on the circumstances that brought him to the doorway in the first instance. Defendants contend that other evidence contradicts Bowe's statements. However, this Court's role is "not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge*, 24 F.3d at 920. Rather, this Court must construe all facts in the light most favorable to Plaintiff and draw all reasonable inferences in Plaintiff's favor. The facts, in the light most reasonable to Plaintiff, show that he only came to the front door after the Defendant officers knocked, he remained inside his home, that he declined to leave his home several times, and that, at the time he was seized by the Defendant Officers, he had turned further into the house and had not been told he was under arrest. Based on these facts, a reasonable jury could find that Bowe was within his home and retained a reasonable expectation of privacy such that the Defendants' actions violated the Fourth Amendment. *See Flores v. Lackage*, 938 F.Supp.2d 759, 767, 773 (N.D. Ill. 2013) (granting a plaintiff's motion for summary judgment on his unlawful entry claim after a defendant officer had "reached through

the doorway threshold" prior to telling plaintiff he was under arrest, when the plaintiff stood "at all times within the threshold of an outer door . . . .")

In their reply, Defendants contend that exigent circumstances justified any unlawful entry, stating that courts in this circuit have found "exigent circumstances justifying warrantless entry where police officers fear a gun may be fired at them or others within a dwelling." *United States v. Barnett*, No. 19-CR-30036-NJR-1, 2020 WL 3962266, at *3 (S.D. Ill. July 13, 2020) (internal citation omitted).  However, arguments raised for the first time on reply are deemed waived. *Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019); *see also Reis v. Robbins,* No. 14-cv-00063, 2015 WL 846526, at *2 (S.D. Ind. Feb. 26, 2015) ("Reply briefs are for replying, not raising new arguments or arguments that could have been advanced in the opening brief.")  Even considering this argument, however, it is unavailing. Here, the undisputed material facts demonstrate that the Defendant officers knew that Bowe carried a box cutter, which was removed from Bowe's pocket before the officers reached for Bowe. Without more, the Court cannot find that the undisputed material facts show exigent circumstances justifying a warrantless entry.

### b.  Excessive Force

Defendants also move for summary judgment on Plaintiff's excessive force claim, first contending that the undisputed material facts demonstrate that the Defendant officers'[4] use of force was reasonable under the circumstances. Specifically, the

---

[4] For purposes of this section, any reference to Defendants or the Defendant Officers refers to Defendants Holcomb and Corban.

Defendants contend that Bowe's noncompliance required the officers to escalate their use of force to gain compliance over Bowe, as law enforcement must "graduate their response to meet the demands of the circumstances confronting them." *Smith v. Ball State University*, 295 F.3d 763, 770 (7th Cir.2002). Plaintiff contends that, because the Defendant officers unlawfully entered his home when they grabbed him from the doorway in the first place, they were not justified in using any force against him.

Excessive force claims are evaluated under the Fourth Amendment's reasonableness standard based on the totality of the circumstances. *See Acevedo v. Canterbury*, 457 F.3d 721, 724 (7th Cir. 2006). "Determining whether force used to effect a particular seizure is reasonable requires balancing of the individual's Fourth Amendment interests against the relevant government interests." *County of Los Angeles Calif. v. Mendez*, 137 S.Ct. 1539, 1546 (2017). Accordingly, courts consider three factors when making this inquiry: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Officers often must make split-second decisions regarding the amount of force necessary in a specific situation. *See id.* at 396-97. Furthermore, courts must consider the facts "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Before such an analysis can occur, the Court must determine that the facts giving rise to a claim of excessive force are undisputed. If there are sufficient undisputed facts to establish that the officer acted reasonably under the circumstances,

then the court should resolve the issue a matter of law. *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2013).

Turning to the facts, Defendants contend that the material facts relevant to Plaintiff's excessive force claim are undisputed. After the Defendant officers arrived at the home, they spoke first to Michelle, who continued to express concern about Bowe's mental wellbeing and who told them that Bowe had thrown a chair at her. After Lawson-Rulli and Holcomb grabbed Bowe as he stood at the door, all three of them fell and landed on the ground below. After hitting the ground, Bowe started to stand up, but Defendant Corban grabbed his legs and brought him back to the ground. The officers contend that, after they grabbed Bowe, they were telling Bowe to show his hands, to calm down, and that he was resisting, but Bowe failed to comply and continued to be physically combative. Bowe concedes that he cannot remember what the officers were saying once they were all on the ground and that "it's possible they said I was resisting." Accordingly, when Bowe failed to respond, Holcomb deployed his Taser prongs and the drive stun. When Bowe failed to comply with the officers' commands and continued to be combative, Defendant Holcomb escalated the amount of force, using open and closed hand strikes on Bowe. After using the strikes on Bowe, the officers were able to handcuff Bowe, and he was compliant. At that point, the officers did not use any additional force.

Plaintiff does not dispute these facts. Instead, Plaintiff, without citation to legal authority, contends that the officer's initial seizure was unlawful, so they were not entitled to use any force. Such perfunctory and undeveloped arguments, without

25

citation to supporting legal authority, are considered waived. *See M.G. Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency*, 845 F.3d 313, 321 (7th Cir. 2017). Even considering this argument, however, the Court has found the opposite: "it is well established that the lawfulness of a temporary detention and the lawfulness of an officer's use of force are separate questions subject to different legal tests[,]" as "the legal enquiries are conceptually distinct." *Haze v. Kubicek*, 880 F.3d 946, 950 (7th Cir. 2018), citing *County of Los Angeles v. Mendez*, 137 S.Ct. 1539, 1547-48 (2017) (stating excessive force claims arising from the same occurrence as other Fourth Amendment claims should be analyzed separately). Indeed, "the lawfulness of an arrest is irrelevant to an excessive force analysis." *Sebright v. City of Rockford*, 585 Fed.Appx. 905, 907 (7th Cir. Nov. 24, 2014); *see also Carlson v. Bukovic*, 621 F.3d 610, 622 n.19 (7th Cir. 2010) (finding that a "seizure without probable cause is conceptually different from a seizure that employs excessive force; both are unreasonable, but for different reasons"). Without more from Plaintiff to support his contention, the Court cannot find that an unlawful entry makes any use of force thereafter *per se* unreasonable.

Accordingly, even viewing the undisputed facts in light most favorable to Bowe, the facts show that the officers had probable cause that Bowe had committed battery against Michelle when he threw a chair at her, that he may be suicidal, that he was resisting and evasive, that he acting as though he was attempting to get away, and that he failed to respond to the officers' commands and graduated use of force. The facts further show that the Defendant officers graduated their use of force based upon Bowe's noncompliance with commands and physically combative behavior. Bowe

admits that the officers may have told him that he was resisting them. Therefore, viewing the facts from the perspective of an officer on the scene, and without more from Plaintiff, the Defendants have shown that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. Accordingly, Defendants' motion for summary judgment as to Plaintiff's excessive force claim should be granted.

### 3.   Whether the Right was "Clearly Established"

The Court now considers the second prong of the qualified immunity analysis: whether the right was clearly established at the time the alleged violation occurred. *See Williams*, 733 F.3d at 758. To be clearly established, a right must be "'sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Once a qualified immunity defense is raised, it is the plaintiff's burden to defeat it. *Alexander v. Milwaukee*, 474 F.3d 437, 443-44 (7th Cir. 2007). Thus, a plaintiff "must identify a case that put[s] [the officers] on notice that [their] specific conduct was unlawful." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8, 211 L. Ed. 2d 164 (2021). "This does not necessarily require the plaintiff to find a factually indistinguishable case on point, but if there is no such case, then he needs to offer a different explanation for why the constitutional violation is obvious." *Moss v. Martin*, 614 F.3d 707, 712 (7th Cir. 2010).

### a.   Excessive Force

27

If the Court does not find that the facts make out a constitutional violation, then the issue of qualified immunity need not be further addressed. *Los Angeles County v. Rettele*, 550 U.S. 609, 616 (2007). Regarding Plaintiff's excessive force claim, the Court has found that the undisputed material facts do not make out a constitutional violation, so the Court is not required to address the second prong on this claim.[5]

### b.    Unlawful Entry

Regarding Plaintiff's unlawful entry claim, the Court has already found that the facts taken in the light most favorable to Plaintiff show that a reasonable jury could find that the Defendant officers violated Plaintiff's privacy rights under the Fourth Amendment when they pulled him from the doorway. Accordingly, the Court now considers whether such a right was "clearly established" on April 3, 2015. *See Williams*, 733 F.3d at 758.

Here, the Defendant Officers contend that they are entitled to qualified immunity because where "the threshold of a home ends and privacy begins is difficult to discern" and that there was "no pre-existing law which would have informed [the officers] that

---

[5] Nevertheless, even if the facts did make out a constitutional violation for Plaintiff's excessive force claim, Plaintiff failed to meet his burden to defeat Defendants' qualified immunity defense. Plaintiff contends that Defendants are not entitled to qualified immunity because Indiana has recognized an exception to the rule that citizens cannot resist an unlawful arrest, pointing to *Adkisson v. State*, 728 N.E.2d 175, 178 (Ind. Ct. App. 2000). It is true that the court in *Adkisson* explained that "where the arrest is attempted by means of a forceful and unlawful entry into a citizen's home, such entry represents the use of excessive force and the arrest cannot be considered peaceable." However, the Indiana Supreme Court has since held that "the right to reasonably resist an unlawful police entry into a home is no longer recognized under Indiana law." *Barnes v. State*, 946 N.E.2d 572, 577 (Ind. 2011); *see also Ocasio v. Turner*, 19 F. Supp. 3d 841, 850 n. 6 (N.D. Ind. 2014). In response to *Barnes*, the Indiana General Assembly amended Indiana Code § 35-41-3-2(i) to provide that "[a] person is justified in using reasonable force . . . if the person reasonably believes the force is necessary to: . .. prevent or terminate [an] unlawful entry of or attack on the person's dwelling . . ." Plaintiff does not address this distinction nor does he explain how Plaintiff's actions in resisting *after* he was pulled from his doorway still fall under Indiana Code § 35-41-3-2(i).

engaging with Plaintiff at the threshold of his open front door would have been a violation of his privacy to invoke the Fourth Amendment protection." [DE 67 at 22]. Plaintiff, however, argues that Seventh Circuit authority in *Sparing* (decided in 2001) and *Berkowitz* (decided in 1991) put the Defendant officers on notice that Plaintiff retained a reasonable expectation of privacy when he responded to a knock at the door when no arrest had been announced. Plaintiff also points to *Kentucky v. King* (decided in 2011). Indeed, *Sparing* and *Berkowitz* explain that an officers' warrantless entry into a home violated the Fourth Amendment after an occupant comes to the doorway in response to an officers' knock when no arrest is announced, but remains inside their home and does not consent to the officers' entry. Moreover, in *Kentucky v. King*, the Supreme Court observed that officers without a warrant may do no more than a private citizen can do when they knock on an individual's door.

Indeed, taken together, this Court agrees that the law surrounding Fourth Amendment doorway arrests and interactions was sufficiently defined such that Defendants were on notice regarding the extent of interactions they could have with Plaintiff while engaging with him at the threshold of his open front door during a welfare check. Specifically, applying the rules from *Berkowitz, Sparing*, and *King* to the specific circumstances of the instant matter, reasonable police officers would have known that entry into a home, by grabbing an individual who was standing within his doorway after the officers' knocked on the door, without a warrant, exigent circumstances, or an announced arrest, was ostensibly unreasonable under the Fourth Amendment. *See also Flores*, 938 F.Supp. 2d at 772-773 (finding that an officer was not

entitled to qualified immunity based upon *Sparing* and *Berkowitz* when the officer reached through an open outer doorway to grab an individual's hands as the individual stood on the inside of a doorway, prior to telling the individual that he was under arrest).

### C.    Plaintiff's State Law Claims

Plaintiff has also alleged state law tort claims for trespass, battery, and excessive force, contending that the Department is vicariously liable for the Defendant Officers' actions. These claims arise out of the same facts as Plaintiff's § 1983 unlawful entry and excessive force claims. Defendants move for summary judgment on these claims, contending that all three are barred by the Indiana Tort Claims Act ("ITCA").

"A governmental entity's immunity from liability under the ITCA is question of law for the court." *Alexander v. City of S. Bend*, 256 F. Supp. 2d 865, 875 (N.D. Ind. 2003). The ITCA provides that tort claims cannot be brought against government employees or governmental entities in certain enumerated circumstances. Ind. Code 34-13-3-3(a)(1)-(24). One circumstance covered by the ITCA is if a loss results from "[t]he adoption and enforcement of or failure to adopt or enforce: (A) a law (including rules and regulations) . . . ." Ind. Code § 34-13-3-3(a)(8).

As an initial matter, when a suit alleges wrongdoing by a government employee for acts he committed within the scope of his employment, the plaintiff is barred from seeking relief personally against the employee. *See* Ind. Code § 34–13–3–5(b). ("A lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally.") A

plaintiff must instead seek relief against the government employer under *respondeat superior*. *Ragnone v. Porter Cnty.*, No. 2:13-CV-164, 2015 WL 5673113, at *11 (N.D. Ind. Sept. 25, 2015). Here, Plaintiff has brought his claims against the Defendant Officers in their individual capacity and states that the officers "acted at all relevant times . . . in the scope of their employment by St. Joseph County Sheriff's Department." [DE 48 at 2, 4 ¶¶ 7-9; 30]. Accordingly, Plaintiff seeks relief for his state law claims against the Department on a theory of *respondeat superior*.

First, Plaintiff has conceded that his state law trespass claim is barred under the ITCA. *See Snider v. Pekny*, 899 F. Supp. 2d 798, 818 (N.D. Ind. 2012) (stating that a plaintiff "cannot recover under Indiana law for his claims of malicious prosecution, trespass and trespass to chattel . . . ." (internal citations omitted)). However, Plaintiff contends that his battery and excessive force claims are not barred, as courts have found that such claims are not shielded from liability under the enforcement of law provision found in Indiana Code § 34-13-3-3(a)(8). *See Wilson v. Isaacs*, 929 N.E.2d 200, 201 (Ind. 2010); *see also Reiner v. Dandurand*, 33 F.Supp.3d 1018, 1032 (N.D. Ind. 2014) (stating "immunity does not apply to claims of assault, battery, and excessive force.").

However, here, the Court has found that Defendants are entitled to summary judgment on Plaintiff's excessive force claims because Defendant's use of force was reasonable under the circumstances. Moreover, Indiana Code § 35-41-3-3(b) also provides that an officer is "justified in using reasonable force if the officer reasonably believes that the force is necessary to effect a lawful arrest." Accordingly, as the undisputed material facts show that the Defendant officers' use of force was reasonable

31

under the circumstances, and Plaintiff has conceded that his state law trespass claim is barred by the ITCA, the Defendants' motion for summary judgment as to Plaintiff's state law claims is granted.

### III.    CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** [DE 66] as follows:

- **DENIED** as to St. Joseph County Sheriff's Department's contention that it cannot be sued for Plaintiff's claims;

- **GRANTED** as to Plaintiff's unlawful entry claim as it pertains to Defendant Corban;

- **DENIED** as to Plaintiff's unlawful entry claim as it pertains to Defendants Holcomb and Lawson-Rulli;

- **GRANTED** as to Plaintiff's excessive force claim against Defendants Lawson-Rulli, Holcomb, and Corban; and

- **GRANTED** as to Plaintiff's state law claims.

Based on the foregoing, Plaintiff's unlawful entry claim against Defendants Holcomb and Lawson-Rulli remain.

**SO ORDERED** this 25th day of July 2022.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge